IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEN PRIDMORE, ) | No. C 08-2941 SBA (PR) |
| ) | |
| Petitioner, ) | **ORDER DENYING PETITION FOR** |
| ) | **WRIT OF HABEAS CORPUS** |
| v. ) | |
| ) | |
| FREDERICK B. HAWS, Warden, ) | |
| ) | |
| Respondent. ) | |
| ———————————————— ) | |

**INTRODUCTION**

This matter is now before the Court for consideration of Petitioner's pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction he received in Santa Clara County Superior Court.  Respondent Frederick B. Haws opposes the petition.  Petitioner has not filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims.

**BACKGROUND**

**I.    Case History**

On November 14, 2005, a jury convicted Petitioner of one count of attempted robbery and one count of robbery (Cal. Pen. Code §§ 211, 212.5(c), 664).  Petitioner admitted to suffering two prior "strike" convictions and to serving four prior prison terms (Cal. Pen. Code §§ 667, 1170.12, 667.5).  On February 10, 2006, the trial court sentenced Petitioner to a term in state prison of fifty years to life plus twenty years.  (Resp't Ex. 1 at 410.)

The California Court of Appeal affirmed the judgment in an unpublished opinion dated November 7, 2007, and the California Supreme Court denied a petition for review on February 13, 2008.  (Resp't Exs. E, G.)

Petitioner filed the instant petition on June 12, 2008, claiming that the failure to sever the trial violated his right to due process and that the prosecutor violated his right to due process by incorrectly describing the people's burden of proof during closing argument.  On October 17, 2008,

1   Respondent was ordered to show cause.  Respondent filed an answer and memorandum of points and

2   authorities on February 13, 2009, and lodged a number of exhibits.  Petitioner received five

3   extensions of time in which to file a traverse, but he ultimately did not file one.

4   **II.**     **Statement of Facts**

5          The following facts are taken from the opinion of the California Court of Appeal:

6       **The Bank of America Robbery**
        On April 1, 2004, Cindy Dickstein was working as a teller at a Bank of America
7       branch in San Jose. Her teller station was the one located closest to the doors leading
        to the parking lot. At about noon, Ms. Dickstein noticed a man she had never seen
8       before walk into the branch with another customer whom she recognized. The man
        walked quickly to a counter in the center of the lobby and wrote something on a
9       withdrawal or deposit slip. When she called to the next customer, the man jumped
        over to her window even though he was not next in line. He passed her the slip with
10      handwriting on it. On the back it said, "Robbery. I'll blow you up fast." She read it
        and felt nervous and scared. The man told her to give him all her largest money,
11      quick. She gave him hundreds and fifties. She did not push the alarm button or give
        him bait money or a dye-pack. The man grabbed the money and walked quickly to the
12      door facing the parking lot. As soon as he walked away from her teller window, she
        told her supervisor, who was just behind her, that she had just been robbed. The
13      manager pressed the alarm while the teller supervisor called 911. Ms. Dickstein spoke
        to the 911 operator.
14

15      After the robbery, Ms. Dickstein did not go outside to look at anyone to see if he was
        the robber. She told the investigating officer that she was too stressed out to do it, and
16      she refused.[1]  She did point out to the police the places inside the bank where the
        robber might have touched and where he wrote the note. No useable latent prints
17      were found on the demand note. A latent fingerprint was successfully lifted from the
        counter in the center of the lobby where the robber wrote his note.
18

19      Yaqueline Sara Torres was Ms. Dickstein's supervisor that day. When Ms. Dickstein
        said "Sara, I got robbed," Ms. Torres looked up and saw the robber leaving, but she
20      only saw him from the back and saw his face "at a flash." She was about 12 to 15 feet
        away from the robber. He was wearing light blue jeans and a denim shirt with some
21      plaid or stripes. He was Caucasian and had long, wavy, greasy brownish-blond hair
        and green, blue or brown eyes, but not black. He was not carrying anything. After he
22      went outside, he headed towards a van in the parking lot that was located in an aisle
        between two rows of parked cars. The van sped out of the parking lot and the robber
23      disappeared. She did not actually see the robber get into the van, but she assumed he
        did.
24

25      Deborah Martinez, an attorney who worked in the building that faces the Bank of
        America, was walking back from court towards her building when she noticed a
26      "grungy-looking man walking quickly from the bank." The two passed within 10 feet
        of each other and she looked at him for 10 seconds. She did not see where he went

27      _____

28          [1]About six months earlier, Ms. Dickstein had been the victim of a bank robbery, but she did
        not remember the details of that one. She thought it might have been a training scenario. She could
        not recall if the police had asked her to step outside to identify the robber after the first robbery or
        the second one, but she did recall that after one or the other she refused to do so, out of fear.

after they passed each other. About five minutes later, from the lobby for her building, she saw about seven police cars converge on the bank's parking lot, and she walked over to the bank to tell the police what she had seen. She described the man she saw as wearing an orange-colored jacket and having an unkempt appearance, but said that she did not get a good look at him. The police drove her to a back alley and asked her to look at somebody. She did not think that the person in the alley was the same person she had passed on the street. The clothing was different; the man she had seen earlier was wearing a jacket and the man in the alley was not. The man in the alley also seemed taller than the man she had seen earlier.

Officer Gregory Morrill was already nearby when he received the call about the bank robbery and responded quickly. He had a description of the robber as an "unkept homeless type, dirty." As he came around a corner, he saw defendant, who matched the robber's description, walking away from the bank. At gunpoint, he ordered defendant to get down on the ground. Morrill explained to him that there had been a bank robbery. Defendant said that he hadn't been in the bank; he was just cutting through. Officer Morrill filled out a field identification card on defendant that day. He wrote that defendant was wearing blue Levi's jacket and pants. He identified himself and gave his birth date. He had a black nylon bag. He was cooperative the entire time. Morrill wrote in a later report that defendant was wearing a red shirt and a sweatshirt, and had a black jacket in his bag. Defendant consented to a search of his bag and his pockets; no large denomination bills were found on him. Officer Morrill detained defendant for 20 to 30 minutes and did not recall him having an accent of any kind. Since defendant was not identified in the field show up, Morrill unhandcuffed him and gave him a ride to Santa Clara Mental Health, where he said he wanted to go. At trial, Officer Merrill identified defendant as the person he detained after the bank robbery, noting that defendant was much heavier, had cut his hair and that he did not recall defendant having glasses on the day of the bank robbery. Shown People's exhibit number 5, Morrill testified that it depicted defendant exactly as he looked on the day of the robbery.

At some point after the robbery, the central identification unit notified the detective in charge of the robbery investigation that the latent fingerprint lifted from counter where people write out their deposit slips matched defendant's left little finger print from a set of prints on file for him. The detective then put together a photo lineup with defendant's photo in it. About two months after the robbery, the photographic lineup was shown to Sara Torres, the teller supervisor. She told the police officer who showed her the photos that the photo of defendant "could be him." The man in the photo had longer hair than the robber's. The investigating detective also called Ms. Martinez to discuss the in-field non-identification of defendant. She told him "it could be, could not be" the man she saw; she said she "wasn't sure."

The robber's image was not captured by the bank's surveillance cameras. Apparently, no handwriting analysis was performed on the demand note.

At trial, Ms. Torres, the teller supervisor, said she did not see the robber in court. Ms. Martinez, the attorney, did not recognize defendant as the man she had seen in the alley.

However, at trial, Ms. Dickstein positively identified defendant as the man who robbed her. She testified that she got a good look at defendant's face from a distance of three to four feet. Her memory of the bank robber's face after more than one year remained very good. Defendant's appearance had changed since the robbery. At that time, he was slimmer, a little bit darker, with unclean hair and generally "just [a] mess." At trial, he had gotten a hair cut and gained a lot of weight. Shown a picture of

3

defendant taken at or near the time of the robbery (People's Exhibit No. 5), Ms. Dickstein identified it as a picture of defendant the way he looked on the day of the robbery.

Ms. Dickstein was less certain about the clothes worn by the robber. On direct examination she testified that the robber was wearing a dark sweatshirt with a hood, blue jeans and tennis shoes. He did not wear glasses. His clothes looked dirty.

However, on cross-examination, Ms. Dickstein said she did "not really" get a good look at the sweatshirt and could not remember if it had a zipper or was a pull over. She acknowledged that she described it to the 911 operator as a jacket. Ms. Dickstein said she was sure the garment was black, but as between a sweatshirt or a jacket, or the type of material "I can't just quite remember ... exactly what he weared [ sic ] that day." As for the jeans, she testified: "I only noticed ... the top of him. I not pay attention to his ... shoes and pants or jeans." She thought jeans were the most likely. Although she testified again that the robber did not wear glasses, she told the 911 operator and investigating police officer that he wore sunglasses, and described them to the police officer as having gold reflective lenses and thin frames.

The robber spoke clearly, without a speech impediment or an accent; Ms. Dickstein described his voice to the police as being of a native Californian.

**The Church's Fried Chicken Attempted Robbery**
On April 30, 2004, Kavita Verma was working by herself at Church's Chicken restaurant. A man came into the restaurant and said something to her; she thought he said "strawberry drink." She replied, "What size?" With a lot of anger, the man said "robbery" and "I want money." Ms. Verma told him she didn't have any. Once she realized the man was there to rob her, Ms. Verma moved towards the phone and picked it up. The man said, "I'll kill you if you call somebody." The robber motioned with one hand as if he were going to slit his throat while he bunched his other hand under his clothing. Ms. Verma was worried that defendant might have something in his hand, but she did not see anything.

Ms. Verma looked out the drive-through window to her right and saw a man sitting on the grass next to it. Trying to get his attention, she said to him, "Excuse me." At that point, the robber ran away. From the drive-through window she saw him cross the parking lot and go into the Chinese restaurant next to it. She called her boss, and then called 911. As she was talking to the 911 operator, she saw the robber jump into a dumpster near some construction that was going on. Two men said something to the robber, and he came out of the dumpster and went under a truck. While she was still on the phone, the police arrived. She saw the police go up to the man.

Defendant was apprehended next to a silver pickup truck located in the rear parking lot of the Chinese restaurant next door to Church's. According to police, defendant "appeared unkempt, like he was homeless." After defendant was taken into custody, a police officer came into the restaurant and asked her to come outside to see if she could identify the man they had caught. Ms. Verma positively identified defendant as the would-be robber. Ms. Verma identified defendant in court as the man who tried to rob her. His appearance had changed since the robbery attempt: "he is kind of chubby now."

**The Defense Evidence**
Dr. David Echeandia interviewed defendant for 90 minutes and found it difficult to understand his speech because of his low, raspy voice and southern accent. Defendant also introduced the audiotape of a 911 call.

4

People v. Pridmore, No. H0299910, slip op. at 2-7 (Cal. Ct. App. Mar. 27, 2007) (Resp't Ex. E).

## DISCUSSION

## I.   Legal Standard

### A.   Standard of Review for State Court Decisions

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### 1.   Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

5

**a.      Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

**b.      "Contrary to"**

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a

prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

### c.    **"Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. <u>Andrade</u>, 538 U.S. at 75-76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging the overruling of <u>Van Tran</u> on this point). After <u>Andrade</u>,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

<u>Id.</u> In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).

**2.      Sections 2254(d)(2), 2254(e)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record.   Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C. § 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." Taylor, 366 F.2d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's

claims, the Court looks to the last reasoned opinion.  See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's claims.

**II.      Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b),(c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).  The parties do not dispute that Petitioner has exhausted his claims.

**III.     Legal Claims**

Petitioner claims: (1) that the trial court's failure to sever the trial on the bank robbery charge and the attempted robbery charge violated his right to due process; and (2) remarks by the prosecutor during closing argument lowered the people's burden of proof, in violation of due process.

**1.      Severance**

Petitioner claims that the trial court violated his right to due process by denying his motion to sever the trial on the bank robbery charge from the charge of attempting to rob the Church's Chicken restaurant.

A joinder, or denial of severance, of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  <u>Grisby v. Blodgett</u>, 130 F.3d 365, 370 (9th Cir. 1997).  The risk of prejudice from the joinder of two sets of charges is enhanced when the evidence is not cross-admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime.  <u>Bean v. Calderon</u>, 163 F.3d 1073, 1084-85 (9th Cir. 1998).  Joinder generally does not result in prejudice if the evidence of each crime is simple and distinct even if the evidence is not cross-admissible, and the jury is properly instructed so that it may compartmentalize the evidence.  <u>Id.</u> at 1085-86.  Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence.  <u>Park v. California</u>, 202 F.3d 1146, 1149-50 (9th Cir. 2000).  If the petitioner shows that the joinder violated

his right to due process, he must also establish that the joinder had a substantial and injurious effect or influence in determining the jury's verdict.  <u>Sandoval v. Calderon</u>, 241 F.3d 765, 772 (9th Cir. 2000).

Petitioner argued in the state courts, as he does here, that joint trial of the two incidents rendered the trial unfair because the evidence on the two charges was not cross-admissible, and because the evidence of the bank robbery was much weaker than the evidence of his attempted robbery of the restaurant, which risked his conviction of the bank robbery simply by virtue of its joinder with the stronger case on the attempted robbery.  The Court of Appeal found that the evidence of the two incidents was not, despite certain similarities, sufficiently similar to be cross-admissible under California law.  (Resp't Ex. E at 8-9 (citing California Evidence Code § 1101(b) and discussing California cases).)  The Court of Appeal went on to find that the lack of cross-admissibility did not render the joinder sufficiently prejudicial either to violate state law or to render the trial fundamentally unfair because the evidence on one count was neither more inflammatory nor significantly stronger than the other, and because the jury could readily compartmentalize the evidence on the two "distinct and easily separable" incidents.  (<u>Id.</u> at 9-13.)  The Court of Appeal reasoned as follows:

**Inflammatory Nature of Case**
As for the second criteria for severance, an unusual likelihood of inflaming the jury against the defendant, the evidence here does not demonstrate that one of the offenses was significantly more likely to inflame the jury against defendant than the other; neither offense involved violence against the victim or sexual or racial overtones or any other factor that might make one offense relatively more inflammatory than the other.

**Weak Case Joined with Strong Case**
Defendant's strongest argument for severance rested in the relative strength of the evidence in the Church's Chicken case as compared with the relative weakness of the evidence in the Bank of America case. However, we cannot say that the evidence of guilt in the Church's Chicken case was significantly stronger than the evidence of guilt in the bank robbery case, such that joinder created the danger that the strong case would be used to bolster the weaker case. Viewed in the abstract, the prosecutor's evidence was equal in strength as to both offenses. In both cases, the victims testified with great certainty that defendant was the robber. In the Church's Chicken attempted robbery, the scenario drawn by the victim's testimony, if believed, proved every necessary element of attempted robbery, and the evidence of her identification of defendant as the would-be robber was strong: she saw defendant run across the parking lot, jump into the dumpster and hide under the truck, and actually watched as defendant was apprehended at the truck by the police.

In the bank robbery case, the scenario drawn by the victim's testimony, if believed,

10

also proved all the necessary elements of robbery, and she was also sure of her identification of defendant.[2] It is true that her description of defendant's clothing was less certain, and that other witnesses-who did not see the robbery-could not positively identify defendant. However, other compelling circumstantial evidence supported the inference that Ms. Dickstein's identification of defendant as the robber was correct, including: the discovery of defendant's fingerprint on the counter where Ms. Dickstein said she saw the robber writing; defendant's denial that he had been in the bank, when coupled with Ms. Dickstein's testimony that she had never seen him in the bank before that day; the shared similarities in the witnesses' description of the fleeing robber as unkempt or grungy; and defendant's detention outside the bank within minutes of the robbery. . . .

The trial court read the parties' legal memoranda, heard argument and, we must presume, weighed all of the appropriate criteria before concluding that joinder "would neither unduly nor unfairly prejudice the defendant." The evidence on each count was simple and distinct. Thus, this was not necessarily a situation in which "the jury would be unable to decide one case exclusively on the evidence relating to that crime." (Williams v. Superior Court (1984) 36 Cal.3d 441, 453; People v. Grant (2003) 113 Cal.App.4th 579, 587 [no abuse of discretion to deny severance when "the counts 'were all very different' "].) "The concept of discretion implies that, at least in some cases, a decision may properly go either way." (In re Large (2007) 41 Cal.4th 538, 553.) This is such a case. Our review has not disclosed that the trial court abused "its discretion in deciding that the beneficial effects of consolidated trial outweighed the potential prejudice." (People v. Balderas, supra, 41 Cal.3d at p. 173.)

**Actual Prejudice/Due Process Violation**
"Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' " (People v. Mendoza, supra, 24 Cal.4th at p. 162, quoting People v. Arias (1996) 13 Cal.4th 92, 127.)

We are not convinced that the fairness of defendant's trial was compromised by joinder as it was in Bean v. Calderon (9th Cir.1998) 163 F.3d 1073 (Bean)], the case on which defendant primarily relies, and which is not binding on us in any event. (People v. Crittenden (1994) 9 Cal.4th 83, 120, fn. 3) In Bean, two murders were joined for a capital trial. In allowing joinder, the trial court found " 'considerable similarity' between the two sets of offenses" and thus no likelihood of prejudice. (Bean, at p. 1083.) Consequently, the prosecutor's argument "encouraged the jury to consider the two sets of charges in concert, as reflecting the modus operandi characteristic of Bean's criminal activities," and the trial court's instructions did not discourage such reasoning on the jury's part, given its "conclusion that the offenses evinced 'considerable similarity.' " (Id. at p. 1084.) Agreeing with the California Supreme Court that the evidence was, in fact, not cross-admissible, the Ninth Circuit also found that the evidence on one of the murders was significantly weaker than the evidence on the other. Given the disparity between the evidence presented on the two sets of offense, the prosecutor's argument and the lack of ameliorative instructions to guide the jury, the Ninth Circuit concluded that the jury could not possibly have

---

[2]The record does not support defendant's view that Cindy Dickstein said defendant " might be the robber but acknowledged she was confusing the facts of this robbery with those of another." (Italics added.) As noted in the statement of facts, Ms. Dickstein positively identified defendant in court as the robber. Her confusion of the two robberies did not relate to her identification of the defendant but to defense counsel's questions about whether she refused to leave the bank to identify a suspect in this case, or in the prior robbery.

compartmentalized the evidence from the two offenses, keeping them separate. ( Id. at ¶ 1085-1086.)

In this case, it is true that the court gave no instruction to the jury that each of the offenses was a distinct crime, or that each count was to be determined individually, or even that the jury could find appellant guilty or not guilty of either or both counts. It is also true that the prosecutor, in response to defense counsel's argument about the dissimilarities between the two cases, briefly argued that both cases shared certain similarities.[3]  However, the similarity between Bean and this case ends there.

Although defendant maintains that the bank robbery was significantly weaker than the restaurant robbery, for the reasons we have discussed above, we disagree. Furthermore, in our view, the jury was not likely to confuse the evidence of the two crimes. Given "the relative simplicity of the issues and the straightforward manner of presentation," the offenses were distinct and easily separable. (United States v. Johnson (9th Cir.1987) 820 F.2d 1065, 1071.) As the Bean court acknowledged, "prejudice generally does not arise from joinder when the evidence of each crime is simple and distinct, even in the absence of cross-admissibility." (Bean, supra, 163 F.3d at p. 1085.)  We conclude that no such prejudice arose here from joinder, and we reject defendant's federal and state claims for reversal on the grounds of actual prejudice based on the joinder only.

(Resp. Ex. E at 8-13 (footnotes in original).)

The California Court of Appeal reasonably found the joinder did not unduly prejudice

Petitioner notwithstanding the lack of cross-admissibility of the evidence of the two incidents.[4]  To

begin with, one incident was not more inflammatory than the other.  The two incidents involved

crimes of a similar level of seriousness – robbery and attempted robbery – in which Petitioner

---

[3]In response to defense counsel's argument that the two cases were so dissimilar that the same person could not have committed both, the prosecutor argued: "Well, there's a lot of similarities. I'm sure a lot stood out to you. Unfortunately, this is the type of thing that criminals fall into patterns on. There are certain types of victims some criminals like. Both our victims here are females. There's a conception among a lot of criminals that females are easier to victimize because they're not as strong as men, they may not be as aggressive as men, they may be more compliant. Both our victims in this case, even though the defendant is Caucasian, are non-Caucasian. Both of them are inside of the business. These weren't follow-a-woman-into-an-alley-and-mug-her type robberies. These were both instances where he walks into a business that's open to the public to commit his crime. Both of them were working at counters at the time. He starts both robberies specifically with the word 'robbery'-not 'give me the money,' no 'hand me everything in the register,' but the first one he passes a note, first word on that note is 'robbery.' The first word he says to Kavita Verma is 'robbery.' She misconstrues it as 'strawberry,' but she realizes once she gets the whole context that he said 'robbery.' ... He only wants money-not 'give me your purse,' not 'give me that food, I'm hungry'-he only wants money. And he's caught at the scene in both cases within at last [sic] 300 yards, if not closer, and within minutes of both robberies. To say there are no similarities between these two cases is inaccurate."

[4]The Court of Appeal's conclusion that the evidence was not cross-admissible under California Evidence Code § 1101(b) is a determination of state law that is binding on federal habeas review.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal court sitting in habeas corpus).

robbed a retail establishment under circumstances in which the female employee reasonably believed she might be in danger if she did not give Petitioner the money he demanded.  Neither crime involved any physical harm, assault or other evidence that would make it more serious or inflammatory than the other.

The state appellate court also reasonably found that the evidence on one incident was not significantly stronger than the evidence on the other.  Both cases rested primarily on the positive identification of the employee from whom Petitioner demanded money, and in both cases, the witness was certain of her identification of Petitioner as the robber.  The positive identification was supported in both cases by additional evidence of comparable strength.  In the bank robbery, the victim's identification was supported by the evidence of Petitioner's fingerprint showing that he had been in the bank, the similar descriptions of the robber by the other witnesses, and Petitioner's detention outside the bank within minutes of the robbery.  In the Church's Chicken charge, the victim's identification was bolstered by the fact that it was made shortly after the robbery and that she actually saw Petitioner run outside, jump into a dumpster and then under a truck where he was apprehended.  Moreover, the evidence of the two incidents was unlikely to buttress each other.  The fact that Petitioner robbed a bank by handing the teller a note did not tend to indicate that he robbed a fast-food restaurant on a different day and in a different location without using a note, and vice-versa.

Finally, the Court of Appeal reasonably found that the jury would easily be able to compartmentalize the evidence of the two incidents because they were "simple and distinct."  See Bean, 163 F.3d at 1085-86.  Each incident was a short and a simple robbery (or attempted robber) by a single defendant of a single victim.  Each incident also occurred on a distinct day in a distinct location and with a distinct method and distinct facts.  Under these circumstances, there is very little likelihood that the jury would have confused the evidence on the two counts or impermissibly used evidence of one count in deliberating about the other.

Based upon this record, the Court of Appeal reasonably concluded that this was not a case in which the joinder of the trial on the two incidents caused undue prejudice.  Consequently, the failure to sever the trial did not violate Petitioner's right to due process, and the state courts' decisions

1  denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly

2  established Supreme Court precedent, nor were they based on an unreasonable determination of the

3  facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

4  **2.    Prosecutorial Misconduct**

5  Petitioner claims that the prosecutor made comments about the reasonable doubt standard

6  during closing argument that lowered the prosecution's burden of proof and violated Petitioner's

7  right to due process.

8  **A.    Background**

9  The California Court of Appeal described the relevant comments and trial court proceedings

10 as follows:

11 The prosecutor argued to the jury: "Now, each crime is made up of what we call
12 elements. And to find the defendant guilty of a crime, jury has to find each element
   proven beyond a reasonable doubt." After briefly arguing that defendant's conduct
13 satisfied each of the elements, he concluded: "Those are the elements of robbery.
   That's all the elements of robbery, all that has to be proven."[5]

14 Defense counsel objected to the following comments, and defendant cites them as
15 misconduct on appeal.

16 "[PROSECUTOR]: It's just reasonable explanations. The only thing that has to be
   proven beyond a reasonable doubt that's applied to this standard, again, is just those
17 elements. Nothing more. There may be other things you want to know, but just
   because you don't know those other things beyond a reasonable doubt, if you just
18 have those five elements, your job's done. [¶] That means reasonable doubt is not I'm
   not sure exactly what happened. We're never sure exactly what happened, because the
19 12 of you weren't there. All right? And people see things from different vantage
20 points. The expectation that you could possibly know exactly what happened in any
   case is wholly unreasonable. That's not reasonable doubt.

21 "[DEFENSE COUNSEL]: Your Honor, I'm going to object. I think that misstates the
22 law.

23 "THE COURT: Well, you'll have the instructions with you. And you may proceed. So
   if there's a doubt what the attorneys say as to the law conflicts with the Court's
24 instructions on the law, you must accept the Court's instructions. You may proceed."

25 Defense counsel did not object to the comments set out below, which followed the
   court's admonition.

26
   "[PROSECUTOR]: Just read the instructions. You'll be able to read all five elements,
27 you'll be able to read the proof-beyond-a-reasonable-doubt instruction, tells you that's

28 _____

[5]Defendant does not assign this passage as misconduct on appeal, nor did he object to it at
trial. We include it because it provides the context for the prosecutor's remarks to which defendant
did object.

what has to be proven beyond a reasonable doubt. [¶] ... [¶] I don't know what the defendant did with the money. That's not an element. Whether he hid the money in the bushes, handed it off to somebody else, whether he had it stuck in the crotch of his underwear and Officer Merrill just didn't find it, that's not an element. Doesn't have to be proven. It's one of those things that, hey, yeah, we'd love to know it.... But it's not an actual element and it doesn't have to be proven beyond a reasonable doubt. [¶] I don't know exactly what the defendant was wearing. Nothing in any of those five elements that says you have to know what he's wearing. It would be great if everyone could come in and describe him to a T, what he was wearing head to toe. But it's not required. And if you think about it, it's not really reasonable to expect that. I mean, do you think it's even possible for somebody to have that good a recollection of somebody that they see for a short period of time? They may try. And they'll make an honest attempt. But as the Court will tell you, sometimes there is innocent misrecollection. Failure of recollection is common. Innocent misrecollection is not uncommon. Just because people can't describe the defendant to a T doesn't mean he didn't do it. And if you have other evidence to corroborate, doesn't mean they have the wrong guy. When you can't describe his clothes but have something like a fingerprint at the scene, that helps corroborate his evidence. Well, gee, he's right outside within minutes. His fingerprint is inside. Says he wasn't inside, and the witness says it was him. Does the facts [ sic ] that maybe she didn't describe him very well clothingwise, maybe she can't remember if he had sunglasses or not, does that really mean he wasn't there. Well, given all that as a whole probably not."[6]

The very next comment, however, drew an objection.

"[PROSECUTOR]: The defendant wanted a trial. That's not reasonable doubt. Just because the defendant wants to assert his constitutional right, it doesn't mean he didn't do it. And he's presumed innocent up until then. But presumption of innocence is, essentially, it's a legal fiction. He either did it or he didn't. The law considers him innocent at this point. But the facts have already occurred. The acts have already happened. (Italics added.)

"[DEFENSE COUNSEL]: Your Honor, I'm going to object to the argument that presumption of innocence is a legal fiction. I think that misstates the law.

"[THE COURT]: Well, disregard the comments about being a legal fiction. That part of the objection is sustained. I'm not going to strike anything, because statements by the attorneys are not evidence and need not be stricken.... You may proceed."

During his closing argument, defense counsel argued, with respect to the abiding nature of a belief held beyond a reasonable doubt: " 'Abiding' ... means that if the deputy right there had an envelope, a magic envelope that had the right answer that told you whether or not Mr. Pridmore's factually innocent-" The court overruled the prosecutor's objection, and defense counsel continued: "-or actually did it, it means that after you make your decision, months later when you're thinking about that magic envelope in the deputy's desk, you won't have any real temptation to call the deputy and say, hey, can you tell me what the answer is in that envelope? Because if you really have an abiding conviction, you don't need to know that. You already know."

The prosecutor offered the following rebuttal to defense counsel's argument, to which

---

[6] Defense counsel also did not object to the following comment: "I don't know if the defendant got in the van or was helped by somebody else, was working alone. Those aren't elements." (Italics added.)

defendant objected below and which he cites as misconduct on appeal:
"[PROSECUTOR]: The whole magic envelope thing. It used to be called God's envelope. But I think there was enough objections to that that it's become now the magic envelope. If you read instruction 2.90, the reasonable doubt instruction, read it over and over, read it backwards, there's no mention of a magic envelope in there. When I talked to you about reasonable doubt, I explained to you it's just-'reasonable' is the key word. Pay attention to that word. I didn't tell you there was stuff in it that's not there. But defense counsel told you not only do you have to follow everything in that instruction but in addition to that, you have to be so certain that beyond reasonable doubt you have to go beyond your own human curiosity just to double-check and make sure you got it right. I doubt there's anybody here who probably hasn't left your house and about halfway to wherever you're going thought, did I lock the door? Did I close the garage door? If you had the opportunity to open up an envelope and check every single time you left the house, not just when you doubt, but every single time, do you think you wouldn't, just to be sure? Of course not. It's human nature. If you've got that opportunity, everybody's going to take it. That's the defense trying to elevate the standard of reasonable doubt to something far beyond what it is."

"[DEFENSE COUNSEL]: Your Honor, I think that misstates our argument. I also think it misstates the instruction of reasonable doubt. It waters it down to normal human interaction throughout the day."

The court overruled the objection, stating: "[L]et's not have speaking objections."

The court day ended before the prosecutor could conclude his remarks. Before the prosecutor resumed his rebuttal argument the next morning, defense counsel memorialized his objections and asked the court to admonish the jury.

First, he objected to the prosecutor's legal fiction comment and asked for a stronger admonition. Next, defense counsel took exception to the prosecutor's argument that "the jury's only required to find each of the elements of the offenses by proof beyond a reasonable doubt," explaining that under CALJIC 2.01, each fact or inference on which circumstantial evidence of guilt rests must be proven beyond a reasonable doubt. "So my argument is that's a misstatement of law, and I request the jury be admonished and it made clear that the beyond-a-reasonable-doubt standard applies also to circumstantial evidence." Third, defense counsel objected the prosecutor's argument "equating beyond a reasonable doubt to everyday life decisions." He asked the court to admonish the jury that "you do not equate proof beyond a reasonable doubt to everyday life decisions, and you are to refer and be bound by 2.90."

Defense counsel also objected to a PowerPoint chart titled "Reasonable Doubt" that was used by the prosecutor during his argument.[7] Finally, defense counsel objected to the prosecutor's comment on the defendant's failure to call witnesses to explain his presence in the bank's vicinity as a comment "on his failure to testify." Defense counsel requested an admonition "reminding the jurors that the defense may rely on

---

[7]Defending his chart, the prosecutor argued that the chart said "here's a list of things that if you're not certain of, that doesn't necessarily mean you have a reasonable doubt. And it specifically listed 'I'm not certain that the police did everything they could have done.' That's not an element of the offense.... 'I'm not certain what clothes the defendant was wearing that day.' That's not an element of the offense. I did not tell the jury that they could still find the defendant guilty beyond a reasonable doubt if they weren't sure of any elements. I simply pointed out there's a lot of red herrings being thrown at them and they don't have to find any of those things beyond a reasonable doubt."

the state of the evidence and the defendant need not testify."

The court considered defense counsel's points "well taken," especially with regard to the "legal fiction" argument. It agreed to admonish with respect to that point, and also to "re-read the part of the jury instructions that says that if anything stated by an attorney during their arguments or regarding the law conflicts with the law presented by the Court, they must reject what the attorney's saying and accept what the Court has said."

The prosecutor resumed his rebuttal argument. Defense counsel objected to the following comments, and defendant cites them as misconduct on appeal.

"[PROSECUTOR]: The defense wants you to think everything has to be proven beyond a reasonable doubt. Like I said, it doesn't. It's the elements of the offense. You can't know everything about a case. Just the elements. Not what he was wearing.

"[DEFENSE COUNSEL]: Your Honor, we're going to object again. This misstates the standard of proof.

"[THE COURT]: And that objection is sustained. You need to focus on the instructions of the law that I've given you that you will have in writing. And if anything that the attorneys say in their arguments conflicts with my instructions, you need to adhere to my instructions. And we'll talk about that a little more.

"[DEFENSE COUNSEL]: Your Honor, for the appellate record, I apologize, but the record should reflect that the screen says, 'The defense wants you to think everything has to be proven beyond a reasonable doubt.' And one of the itemized bullet points says, 'Just the elements have to be proven.'

"[THE COURT]: All right. And that is correct. The screen also says some other things. Is there anything else that you would like to memorialize, [Mr. Prosecutor].

"[PROSECUTOR]: No.

"[THE COURT]: All right. You just need to focus on the facts that the standard is beyond a reasonable doubt. You've heard a lot of analogies. You need to focus on the jury instruction 2.90, nothing else. [¶] Go ahead.

"[PROSECUTOR]: Let me make this very clear. Any fact that you rely upon to find any element proven beyond a reasonable doubt, you have to find beyond a reasonable doubt. All right? [¶] Identification is the issue for this robbery. Defense has told you that. Well, you spent a week with me now. What was I wearing last Thursday? We were in the courtroom a full day. I gave you an opening statement for approximately 10 minutes. [¶] If we picked two of you, do you think you could all agree on color of my suit, color of my shirt, what my tie looked like, what my shoes looked like? Color of my socks, did my belt match my tie? Was I wearing my silver glasses-

"[DEFENSE COUNSEL]: Your Honor. I'm sorry.

"[THE COURT]: Sustained. Sustained. The objection is sustained.

"[DEFENSE COUNSEL]: Request that the jury be admonished they are not to engage in experiments or comparisons on their own.

"[PROSECUTOR]: "If I can have two more sentences, I think the point of my argument will be clear that it's not an experiment.

17

1    "[THE COURT]: Well, that objection is sustained. Why don't you conclude your
     argument shortly.

2

3    "[PROSECUTOR]: All right. Even if you couldn't remember what I was wearing,
     does it change the fact that you know it was me?

4    "[DEFENSE COUNSEL]: Your Honor, objection. Same objection.

5    "[THE COURT]: Same ruling. The objection is sustained.

6    "[DEFENSE COUNSEL]: I request an admonishment that the jury disregard that
     comment.

7    "[THE COURT]: Please disregard the comments."

8    At the conclusion of the prosecutor's final summation, the court instructed the jury as

9    follows: "So you've heard a lot of argument. And we are very fortunate to have very
     experienced, excellent attorneys who are both excellent advocates for their relative

10   positions. There have been many objections, some of them sustained, some of them
     overruled. I want to remind you that if anything concerning the law said by the

11   attorneys in their arguments or at any other time during it the trial [ sic ] conflicts
     with my instructions on the law, you must follow my instructions. [¶] Moreover, I'd

12   like to underscore just a few things. I want to underscore the fact that the presumption
     of innocence is not a legal fiction. It is the law. You are bound by jury instruction

13   2.90 that deals with the presumption of innocence and with the definition of beyond a
     reasonable doubt. You also heard both attorneys make analogies when they were

14   dealing with what constitutes an abiding conviction of the truth of the charge. You
     heard about magic envelopes. You heard about appliances being plugged or

15   unplugged, garage doors being left open. Once again, they are making their
     arguments to you. You are bound by jury instruction 2.90. And I will spare you with

16   having to re-read everything, but I do have some final instructions that I do need to
     read to you before you proceed with your deliberations. [¶] ... [¶] The instructions

17   which I am now giving to you will be made available in written form, if you so
     request, for your deliberations...."

18

19   (Resp't Ex. E at 13-20.)

20                **B.        Discussion**

21          Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of

22   review is the narrow one of due process and not the broad exercise of supervisory power.  <u>Darden v.</u>

23   <u>Wainwright</u>, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a

24   prosecutor's misconduct renders a trial "fundamentally unfair."  <u>Id.</u>  Under <u>Darden</u>, the first issue is

25   whether the prosecutor's remarks were improper; if so, the next question is whether such conduct

26   infected the trial with unfairness.  <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005).  A

27   prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to

28   determine whether the prosecutor's remarks so infected the trial with unfairness as to make the

     resulting conviction a denial of due process.'"  <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995)

                                              18

1    (citation omitted).

2          Petitioner argues that the prosecutor misstated the law on the prosecution's burden of proof

3    by arguing that the prosecution only had to prove the elements of the offense, and not the underlying

4    facts, beyond a reasonable doubt.  Such a characterization of the prosecution's burden of proof

5    would indeed be incorrect.  As correctly stated in the California Court of Appeal opinion, due

6    process requires the facts upon which the proof of an element is based must also be proved beyond a

7    reasonable doubt:

8              "[T]he Due Process Clause protects the accused against conviction except upon proof
               beyond a reasonable doubt of every *fact* necessary to constitute the crime with which
9              he is charged." (In re Winship (1970) 397 U.S. 358, 364, italics added.) "The
               prosecution bears the burden of proving all elements of the offense charged
10             [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts
               necessary to establish each of those elements." (Sullivan v. Louisiana (1993) 508
11             U.S. 275, 277-278 (Sullivan), italics added.)

12   (See Resp't Ex. E at 21-22.)  The prosecutor's comments were, however, ambiguous on this point.

13   As described above, on the one hand he stated that on several occasions that the people only had to

14   prove the "elements" beyond a reasonable doubt, but on one occasion he also stated "Let me make

15   this very clear. Any fact that you rely upon to find any element proven beyond a reasonable doubt,

16   you have to find beyond a reasonable doubt." (Id. at 19.)

17
           Most importantly, however, even if the prosecutor's comments incorrectly implied that the
18
     prosecutor did not have to prove any facts beyond a reasonable doubt, as Petitioner argues, the trial
19
     court's curative steps prevented such comments from misleading the jury as to the correct standard.
20
     First, the trial court gave the jury the instructions setting forth the correct reasonable doubt
21
     standard.[8]  The trial court also sustained defense counsel's numerous objections to the prosecutor's
22

23   _____

24         [8]Prior to argument, the trial court gave CALJIC Nos. 2.91 and 2.92, as follows:

25         You may find evidence that a person other than the defendant committed the crime
           alleged in Count 2. If such evidence of third party culpability raises a reasonable
26         doubt of defendant's guilty [ sic ] as to that offense, you must find the defendant not
           guilty. The weight and significance of third party culpability, if any, are matters for
27         your determination. If, after the consideration of this evidence you have a reasonable
           doubt that the defendant committed this offense, you must give the defendant the
28         benefit of the doubt and find him not guilty.

           The burden is on the People to provide beyond a reasonable doubt that the defendant
           is the person who committed the crime with which he is charged. If after considering

comments.  In addition, the trial court repeatedly admonished the jury that the prosecutor's

comments are not evidence and are not to be followed to the extent they conflict with the correct

standard set forth in the jury instructions.  The jury is presumed to have followed both the trial

court's admonishments to this effect as well as the correct reasonable doubt instructions themselves.

See Tan, 413 F.3d at 1115 ("we presume jurors follow the court's instructions absent extraordinary

circumstances").  A prosecutor's mischaracterization of a jury instruction, as opposed to an

erroneous instruction by the trial court, is less likely to render a trial fundamentally unfair because

> arguments of counsel generally carry less weight with a jury than do instructions
> from the court.  The former are not evidence, and are likely viewed as the statements
> of advocates; the latter, we have often recognized, are viewed as definitive and
> binding statements of the law.  Arguments of counsel which misstate the law are
> subject to objection and to correction by the court.  This is not to say that
> prosecutorial misrepresentations may never have a decisive effect on the jury, but
> only that they are not to be judged as having the same force as an instruction from the
> court.

Boyde v. California, 494 U.S. 370, 384-85 (1989) (citations omitted).  Where, as here, the trial court

repeatedly instructing the jury on the correct reasonable doubt standard, admonished the jury not to

follow any conflicting statements by the prosecutor, and sustained defense counsel's objections to

the prosecutor's comments, the trial court effectively remedied any misstatement of the law that the

jury might have inferred from such comments.  See, e.g., Darden, 477 U.S. at 182 (egregious,

inflammatory comments by the prosecutor did not render the trial unfair because curative actions

were taken by the trial judge).  Consequently, the prosecutor's comments did not render the trial

fundamentally unfair in violation of Petitioner's right to due process.

The state courts' decisions denying Petitioner's claim were not contrary to, or an

unreasonable application of, clearly established Supreme Court precedent, nor were they based on an

unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. §

2254(d)(1),(2).

**CONCLUSION**

_____

the circumstances of the identification and any other evidence in this case you have a
reasonable doubt whether defendant was the person who committed the crime, you
must give the defendant the benefit of the doubt and find him not guilty.

(Resp't Ex. E at 23 n.8.)

1    For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of

2  the Court shall enter judgment and close the file.

3    No certificate of appealability is warranted in this case.  See Rule 11(a) of the Rules

4  Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (requiring district court to rule on certificate of

5  appealability in same order that denies petition).  Petitioner has failed to make a substantial showing

6  that any of his claims amounted to a denial of his constitutional rights or demonstrate that a

7  reasonable jurist would find this Court's denial of his claims debatable or wrong.  See Slack v.

8  McDaniel, 529 U.S. 473, 484 (2000).

9    IT IS SO ORDERED.

10  DATED: 9/15/10

11                                              SAUNDRA BROWN ARMSTRONG
                                               United States District Judge

1

2

3

4   UNITED STATES DISTRICT COURT
    FOR THE
5   NORTHERN DISTRICT OF CALIFORNIA

6   DAVID L PRIDMORE,

7                    Plaintiff,                    Case Number: CV08-02941 SBA

8        v.                                        **CERTIFICATE OF SERVICE**

9   FREDRICK B HAWS et al,

10                   Defendant.

11   _____/

12   I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.
13

14   That on September 15, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
15   envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
    located in the Clerk's office.
16

17

18   David Len Pridmore F-18669
    Salinas Valley State Prison
19   P.O. Box 1050
    Soledad, CA 93960
20

21   Dated: September 15, 2010

22                                                Richard W. Wieking, Clerk
                                                  By: LISA R CLARK, Deputy Clerk
23

24

25

26

27

28